FILED

99 APR 30 PM 1: 35

U.S. DISTRICT COURT
N.D. OF ALABAMA

ENTERED
APR 29 1999

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

NELDA JEAN JOHNSTON, as )
Administratrix of the Estate of Michael )
James Cuzzort, )
 )
    Plaintiff, )
 )
 ) CV 97-BU-2694-M
vs. )
 )
CITY OF ALBERTVILLE, ALABAMA, et al., )
 )
    Defendants. )

## Memorandum Opinion

    This cause comes on to be heard on a motion for summary judgment filed on December 15, 1998, by the defendants, City of Albertville, Alabama ("Albertville"), the City of Albertville Police Department ("Police Department"), Randy Amos ("Amos"), in both his individual and official capacities, Jamie Smith ("Smith"), in both his individual and official capacities, and Ben Womack ("Womack"), in both his individual and official capacities. In their motion, the defendants contend that the plaintiff, Nelda Jean Johnston, is unable to present a genuine issue of triable fact on her claims (1) that Smith and Womack used excessive force against the decedent, James Cuzzort ("Cuzzort"), in violation of his Fourth Amendment right against unreasonable searches and seizures; (2) that Amos is liable as a supervisor of Smith and Womack for the alleged Fourth Amendment violation; (3) that Albertville and the Police Department are liable as municipalities for the alleged Fourth

Amendment violation;[1] and (4) that all defendants are liable under the Americans with Disabilities Act for a discriminatory failure to treat the decedent because he suffered from autoimmune deficiency syndrome ("AIDS"). While conceding that she can raise no genuine issue of triable fact as to the claim that Cuzzort was discriminated against on the basis of his having AIDS, the plaintiff maintains that she can present a genuine issue of triable fact with respect to the remainder of her claims.

Summary judgment provides the parties an invaluable opportunity to test the mettle of a case before it ever reaches trial. On a motion for summary judgment, the court assesses all of the proof the parties can bring to bear in order to ascertain whether a genuine need for trial is present. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is weighed heavily in favor of the non-movant; it is appropriate only if the court concludes that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

A party seeking summary judgment has the initial responsibility of informing this court of the grounds for its motion and specifically identifying those portions of the pleadings, depositions, answers to interrogatories, admissions on file, and any affidavits that it believes demonstrate the absence of a genuine issue of material fact. *Id.* at 323. The movant's burden is not meager; it must illuminate for the court the reasons why the non-movant cannot or does not raise a genuine issue of material fact sufficient to support a trial.

Once the moving party has satisfied this initial burden, however, the nonmoving party "must make a sufficient showing to establish the existence of each essential element to that party's case, and on which that party will bear the burden of proof at trial." *Howard v. BP Oil Company*, 32 F.3d 520, 523 (11th Cir. 1994). Rule 56(e) requires the nonmoving party to "go beyond the pleadings" and by "affidavits, or by the 'depositions, answers to

---

[1] The court notes that recovery against the Police Department will be redundant to any recovery against Albertville itself. As such, the court will treat the use of Police Department and Albertville as one in the same entity for purposes of this motion.

interrogatories, and admissions on file' designate 'specific facts'" showing there exist genuine issues for trial. *Celotex*, 477 U.S. at 324; *Cottle v. Storer Communication, Inc.*, 849 F.2d 570, 575 (11th Cir. 1988). "Tenuous insinuation" and empty speculation based on loose construal of the evidence will not satisfy the non-movant's burden. *Cf. Mesnick v. General Elec. Co.*, 950 F.2d 816, 820 (1st Cir. 1991), *cert. denied*, 504 U.S. 985 (1992).

While the court may consider the offered "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any" in deciding whether to grant or deny a summary judgment motion, FED. R. CIV. P. 56(c), the Rule "saddles the non-movant with the duty to 'designate' the specific facts in the record" supporting its claims. *Jones v. Sheehan, Young & Culp, P.C.*, 82 F.3d 1334, 1338 (5th Cir. 1996). "Rule 56 . . . does not impose upon the district court a duty to survey the entire record in search of evidence to support a non-movant's opposition." *Id. See also Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir.) ("There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment."), *cert. denied*, — U.S. —, 116 S.Ct. 74 (1995).

In resolving whether a given factual dispute requires submission to a jury, the court must inspect the presented evidence through the looking glass of each party's substantive evidentiary burden. *Anderson*, 477 U.S. at 254-55. The court, however, must avoid weighing conflicting evidence for probity or making credibility determinations. *Welch v. Celotex Corp.*, 951 F.2d 1235, 1237 (11th Cir. 1992). "It is not part of the court's function, when deciding a motion for summary judgment, to decide issues of material fact, but rather decide whether such issues exist to be tried. The Court must avoid weighing conflicting evidence or making credibility determinations." *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913, 919 (11th Cir. 1993). At the same time, "[t]he nonmoving party must provide more than a mere scintilla of evidence to survive a motion for judgment as a matter of law; 'there must be a substantial conflict in evidence to support a jury question.'" *Tidwell v. Carter Products*, 135 F.3d 1422, 1425 (11th Cir. 1998) (*citing Carter v. City of Miami*, 870 F.2d 578, 581 (11th Cir.1989)).

Facts[2]

On the afternoon of October 13, 1995, the decedent, Cuzzort, ran into the residence of Diane Little and her husband, shouting that the police were after him and that he had swallowed "it." He then collapsed on the floor of the Little's home. Mr. Little dragged the seemingly unconscious Cuzzort to his truck and placed him in the truck bed to take him to the hospital. Mrs. Little apparently accompanied Cuzzort in the bed of the truck. En route to the hospital, Cuzzort began to flail about, hitting Mrs. Little. Mr. Little stopped the truck and Mrs. Little leapt out of the truck bed. Together, she and Mr. Little went to the home of the son of Ms. Newyln Rains Pankey.[3] There, Mr. Little used the phone to call 911.

Officer Smith responded to a dispatch indicating that an automobile wreck had occurred at the intersection of East Main Street and Sycamore Lane in Albertville, Alabama. When Smith arrived at the scene of the reported accident, the Little's truck was parked, but running in the middle of the intersection, with the Littles standing near it. Mrs. Little approached Smith and informed him of the situation. Smith then looked into the bed of the truck and saw a man, his eyes glazed, wearing nothing but shorts, a shoe and a sock, stretched on his back, flailing, foaming at the mouth and raving incomprehensibly.[4] Smith returned to his car and called for assistance, allegedly stating that he was about to deal with someone on drugs. At approximately the same time, two emergency medical technicians, Gary George ("George") and Neal Mikel ("Mikel") arrived on the scene. George and Mikel

---

[2] "The facts set out below are gleaned from the parties' submission of facts claimed to be undisputed, their respective responses to those submissions, and the court's own examination of the record." *Underwood v. Life Ins. Co. of Georgia*, 14 F.Supp. 2d 1266, 1267 n.1 (N.D. Ala. 1998). The factual narrative presented here is developed in the light most favorable to the plaintiff and with all *reasonable* inferences drawn in support of the plaintiff's position. Whether this narrative would be borne out in the facts developed at trial is another matter. *See Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1400 (11th Cir. 1994)

[3] The son's name is not revealed in deposition testimony. Ms. Pankey was at her son's home hanging wallpaper on that day. Neither her son nor his wife were at home.

[4] According to Officer Smith, Cuzzort stated only one understandable sentence before Smith approached him in the bed of the truck, "you aren't going to get me."

removed the stretcher from the emergency medical vehicle and placed it at the vehicle's rear bumper. Mrs. Little approached Mikel and informed him that, in her opinion, Cuzzort was under the influence of a controlled substance.

Smith walked nearer to Cuzzort and asked him what was wrong. Cuzzort did not respond. According to Smith, he could only make out one statement, "They're after me." The officer then approached the emergency medical technicians to inform them that he had called for assistance. Mikel next attempted to approach Cuzzort but found him to be seizing too violently to safely treat.

Cuzzort then fell out of the bed of the truck, striking his head on the pavement, and he rolled beneath a corner of the truck into a culvert filled with leaves and dirt.[5] There was, apparently, no attempt made to move him from that spot. Assistant Chief of Police Womack arrived shortly afterward and, after getting out of his car, walked to where Cuzzort lay on the ground. As Womack walked to where Cuzzort lay, George approached Womack and informed him of his belief that Cuzzort had swallowed a controlled substance. Smith accompanied Womack to Cuzzort's thrashing body. At this point witnesses' recollections of events that occurred diverge: On one recollection of events, Womack and Smith spent a moment watching Cuzzort seize and convulse. Then, together, the officers bound Cuzzort's hands in handcuffs and his feet in flex cuffs. Because Cuzzort continued to pitch about, Womack sprayed a pepper spray, "Freeze +P,"[6] in Cuzzort's face to calm him. Cuzzort slowly stopped moving. After his movement had ceased, neither Smith nor

---

[5] There is some dispute as to whether Cuzzort stood up and walked backward out of the truck or whether in his seizure he threw himself out of the truck. Nor is there any certainty as to whether the tailgate of the truck was up or down, a fact which would resolve this minor factual dispute one way or the other.

[6] "Freeze +P" is a brand of oleoresin capsicum spray, also known as pepper spray. According to one expert, H. Chip Wells, the spray consists of an extract of an oily resin of pepper, capsicum, that is suspended in an alcohol base. It causes a burning sensation in the eyes, nose and ears, including tearing. Skin exposed to the substance will turn red, potentially blistering. If inhaled, it will cause an individual to have trouble breathing and if swallowed, it can cause vomiting. Its effects last anywhere from five minutes to forty-five minutes. Its effects can be eliminated by washing the areas exposed, but relief is not immediate and often consists of little more than a mild lessening of the physical effects, as indicated by the testimony of Smith, who was at one time sprayed with the substance.

Womack attempted to move Cuzzort, but left him lying in the street. Instead, the officers stood talking with the emergency medical technicians. A few minutes later, Cuzzort began to spasm once more. Womack again applied the pepper spray to Cuzzort's face and Cuzzort fell motionless.

On the second recollection of events, Womack did not stop to speak to Cuzzort in order to calm him nor did he use "open hands" force to restrain Cuzzort's movement. Rather, he simply walked up to Cuzzort, aimed his can of pepper spray at Cuzzort's face, and fired. Cuzzort reflexively grabbed his face. At this moment, Womack and Smith leapt on Cuzzort, pulled his arms back, and handcuffed his hands together. Cuzzort's legs continued to kick about and Smith asked one of the emergency medical technicians to bring him his flex cuffs. After they were brought to Smith, he placed the flex cuffs on plaintiff's feet. On either account, at some point during this activity, Cuzzort's face turned noticeably ashen.

The diverging narratives reintegrate at this point. Having restrained Cuzzort and believing that if Cuzzort began to flail about again the restraints in the emergency medical vehicle could not restrain him,[7] Smith, Womack, Mikel and George placed Cuzzort in the back of Smith's patrol car, face down, for transport to the hospital. It took three minutes for Smith to drive Cuzzort to the hospital. According to Smith, when he got out of the car at the hospital, he noticed that Cuzzort was not breathing and called for immediate help. Cuzzort's heart had ceased to beat and he was in full cardiac arrest. Cuzzort was pronounced dead in the early hours of October 14, 1995, within twelve hours of his arrival at the Little's home, the cause of death stated to be acute cocaine toxicity.

---

[7] Apparently, the straps in the emergency medical vehicle were velcro and could not be relied upon to restrain Cuzzort.

Contentions & Analysis

The plaintiff's claims against Albertville, Amos, Smith and Womack arise out of the same alleged constitutional violation: the use of excessive force by officers Smith and Womack in applying pepper spray against Cuzzort and in not permitting Cuzzort to be taken to the hospital by the emergency medical technicians, but requiring him to lie face down in the back of a patrol car after having been sprayed with the oleoresin capsicum spray. As such, the court will first consider whether the actions of officers Smith and Womack violated a constitutional right of Cuzzort.

The parties argue the instant case as though the plaintiff's claims involve the violation of Cuzzort's Fourth Amendment right against unreasonable searches and seizures. However, the court notes, as an initial matter, that the instant case does not involve a seizure in the traditional sense of either an arrest requiring probable cause of a crime or a *Terry* stop requiring reasonable suspicion of danger to the officer. The officers were not attempting to hold the plaintiff on the basis of probable cause that the plaintiff committed an offense. Rather, the officers were, according to their account, attempting to restrain a resistant individual in order that he might receive medical treatment.

Nonetheless, the instant claim falls within the purview of the Fourth Amendment, the protections of which are triggered not only by a criminal arrest, but simply through the seizure of an individual. "The word 'seizure' readily bears the meaning of a laying on of hands or application of physical force to restrain movement, even when it is ultimately unsuccessful." *California v. Hodari D.*, 499 U.S. 621, 626 (1991); *see also County of Sacramento v. Lewis*, 118 S.Ct. 1708, — U.S. —, — (1998) (holding that a seizure exists where there is successful, intentional touching of a person meant to restrain that person or an intentional show of authority which successfully restrains the person). The constraint of Cuzzort undertaken by the officers was thus a seizure, the conditions and extent of which are prescribed by the Fourth Amendment's search and seizure clause.

In *Nolin v. Town of Springville*, — F.Supp.2d —, —, 1999 WL 183803 at *7 (N.D. Ala. 1999), this court explained the requirements of proving a Fourth Amendment excessive force claim.

> In the aftermath of [*Graham v. Conner*, 490 U.S. 386, (1989)], the Eleventh Circuit Court of Appeals has developed a different approach to excessive force claims than that pursued originally. The approach developed is fact sensitive, examining whether any of the force used was necessary to effect the arrest and, of the force that was not, whether it was reasonable in light of the factors announced in *Graham*, i.e., "the severity of the crime, whether the suspect poses an immediate threat, and whether the suspect is resisting or fleeing." *Post v. Fort Lauderdale*, 7 F.3d 1552, 1559 (11th Cir. 1993), *modified*, 14 F.3d 583 (11th Cir. 1994). This court undertakes this analysis in the light that the reasonable officer would have viewed the circumstances with which the actual officer was presented. *See id*.

Many of the aspects of this case render the standard *Graham* analysis inapplicable. First, the court must resolve whether any of the force utilized in either the restraining of Cuzzort by the officers or the placing of Cuzzort face down in the back of the police vehicle was necessary to affect a seizure for which the officers had probable cause. *See Thornton v. City of Macon*, 132 F.3d 1395, 1400 (11th Cir. 1998). The officers were not engaged in affecting an arrest for an offense. Therefore, no amount of force can be deemed attributable to such necessity. Also, the defendants have brought forward no evidence that under § 22-52-91,[8] the officers had authority to detain Cuzzort because he was apparently mentally ill and was likely to be an immediate danger to himself or others, justifying some necessary force in the statutorily permitted seizure; therefore, it is inappropriate to consider whether the force used was necessary to affect a seizure permitted by Alabama law.

Rather, the core of the analysis in this case is simply whether the force used by the officers, in either restraining Cuzzort or in placing him in the back of the police vehicle was reasonable: In considering the factors as to whether the initial restraint was reasonable, the court will consider both accounts of the events involved in Womack's use of pepper spray

---

[8] A law enforcement officer can only lawfully seize an individual under § 22-52-91 where the requirements of § 22-52-92 have been met in the county in which the officer is operating. No evidence of such authority was offered in this case; it is questionable whether such authority even exists in a purely medical emergency, where it is unclear that mental health concerns are involved.

against the decedent. On either account given, because Cuzzort was not being arrested, the court need not consider the *Graham* factor relating to the severity of any crime the decedent might have committed. With regard to the second and third *Graham* factors, on the account given in which the officers restrained Cuzzort in handcuffs and flex cuffs before spraying him, Cuzzort had ceased to pose a threat to the officers, the emergency medical technicians or any other individuals. The only person to whom he could cause harm at that point was himself. Therefore, the subsequent administration of pepper spray by Womack to the face of the decedent was clearly unnecessary to prevent Cuzort from posing a threat to others. On the account of events in which Womack simply walked up to Cuzzort and sprayed him in the face, without either officer making the attempt to subdue him in handcuffs and flex cuffs, Womack's actions are blatantly out of proportion to the situation, particularly as neither officer had attempted to determine what resistance the decedent would put forward to prevent being cuffed. The court notes that Albertville's written policy only sanctioned the use of pepper spray in the controlled environment of a jail, where appropriate treatment could be given to the individual sprayed. It had not been authorized for use by patrol officers not working in the jail. A reasonable trier of fact could find that Womack's use of the pepper spray violated the decedent's Fourth Amendment right against unreasonable seizures.[9]

Officer Smith's liability with regard to the use of the pepper spray will depend somewhat on the liability of Officer Womack. In the instant case, it was Womack who sprayed the decedent; Smith "merely" stood by and allowed the spraying of Cuzzort to happen. However, an officer who sees and is capable of intervening in another officer's use of excessive force, has a duty to intervene. *See Ensley v. Soper*, 142 F.3d 1402, 1407 (11th Cit. 1998). Smith, while not himself violating a Fourth Amendment right of the decedent, had a

---

[9] The court is aware of a very real problem in this case, in that, officers should be encouraged to act as good Samaritans when confronted with an individual who is in physical distress. However, there is a difference between calming or passively restraining an injured individual in order that treatment can be performed and taking aggressive physical action that does more harm than good.

duty to intercede in the use of excessive force by Womack; his failure to do so is in itself a Fourth Amendment violation.

The placement of Cuzzort in the back of the police vehicle rather than in the emergency medical vehicle, while troubling, does not constitute a Fourth Amendment violation.[10] The officers reasoned that the decedent could be as easily transported to the hospital in the patrol car as in the emergency medical vehicle and they reacted carefully to a reasonable concern that Cuzzort might become uncontrollable and unrestrainable in the medical vehicle, as opposed to the patrol car. While perhaps, the more insightful course of action would have been to cuff the decedent to the stretcher and place him in the emergency medical vehicle, the actions and force used by officers in an emergency situation need not be the best response, but merely a reasonable response.

The plaintiff claims that the officers actions were patently unreasonable in light of the possibility of positional asphyxia resulting from placing Cuzzort being placed face down in the back of the patrol car. However, the defendant officers testified as to no knowledge of the existence of the possibility of positional asphyxia in suspects placed face down in a patrol car. While the willful and unreasonable ignorance of an officer is not to be sanctioned, no officer can be thought to know all contingencies that flow from his or her choices. Generally, in considering whether an officer has used reasonable force, the court need only consider whether the forced used was reasonable in light of the officers' knowledge of both about the events before him and his past experience. The plaintiff's claim that Cuzzort's Fourth Amendment right against excessive force was violated when he was placed in the back of the police vehicle will be dismissed.

Officers Womack and Smith contend that they are immune from liability because they are protected by qualified immunity from the suit. As a Fourth Amendment excessive

---

[10] It is quite likely that the claim of placement in the back of the patrol car is a Fourteenth Amendment Due Process, rather than a Fourth Amendment search and seizure, claim. However, the plaintiff has failed to argue his claim as such and, hence, it will be treated solely as a Fourth Amendment claim.

force case has not been previously presented to either the Supreme Court or the Eleventh Circuit Court of Appeals on facts sufficiently similar to create a rule governing this type of excessive force claim, liability against either officer will only lie if "the official's conduct lies so obviously at the very core of what the Fourth Amendment prohibits that the unlawfulness of the conduct was readily apparent to the official, notwithstanding the lack of caselaw." *Smith v. Mattox*, 127 F.3d 1416, 1419 (11th Cir. 1997). The court is of the opinion that the action by Womack here did lie at the core of the Fourth Amendment's protection. The existence of any mild threat posed by Cuzzort to the officers was either controlled or undetermined and there was no attempt to seize Cuzzort pursuant to Alabama statute for commission of a crime or for involuntary commitment. While the use of pepper spray does not paint so graphic a picture as whirling batons or bloody fists, its use on the convulsing Cuzzort, was little more than a chemical means of beating him into submission.[11] However, it is unclear how Smith could have stopped Womack once he realized that Womack was preparing to use the oleoresin capsicum spray on Cuzzort other than leap in the way. There is no clear requirement that the officer do this in performing his duty to prevent the use of excessive force. Smith will, therefore, be entitled to qualified immunity from suit in the instant action of the plaintiff's claim of excessive force involving the use of the pepper spray.

Amos has invoked the defense of qualified immunity to the claim that he is supervisorily liable for the Fourth Amendment violation. In order for Amos to be liable for the actions of Womack and Smith it must be the case that "a reasonable person in the supervisor's position would have known that his conduct infringed the constitutional rights

---

[11] The plaintiff has put forward testimony that among its effects, pepper spray causes respiratory problems to those sprayed, which, while harmless on most occasions, could have led to the lethal results in the instant case. However, the weakness of the plaintiff, unless perceived by the officer using the force, does not impact the determination of whether the force itself was any more or less excessive — force is not measured by its damaging effects but by the circumstances and extent of its actual use. Whether or not a plaintiff, such as this one, was an eggshell plaintiff is a matter for the determination of damages.

The defendants also argue that Womack did not know of any adverse medical consequences of use of pepper spay other than its immediate visible effects. There remains a jury question of whether a reasonable officer in Womack's position should have known of those effects.

of the plaintiff and his conduct was causally related to the constitutional violation committed by his subordinate." *McKinney by McKinney v. DeKalb County, Ga.*, 997 F.2d 1440, 1443 (11th Cir. 1993). In the instant case, Amos did not know of, nor did he prescribe the use of pepper spray on individuals who were not either pre-trial detainees or prisoners in the city's jail. Indeed, Womack was entirely in charge of Albertville's pepper spray use policy. Therefore, Amos is not liable for any fourth amendment right violated by Womack.

However, as has been noted, a genuine issue of material fact exists as to whether Womack was the individual given responsibility by Amos for the creation of guidelines for the use of pepper spray and for training others in the use of pepper spray. If so, Womack had been delegated final policymaker authority with regard to the use of pepper spray in the Police Department — i.e., he would have been permitted to craft all policy with regard to the use of pepper spray apparently without the interference or review of his supervisor, Amos. *See Scala v. City of Winter Park*, 116 F.3d 1396, (11th Cir. 1997). Even though Albertville maintained an official policy restricting the use of pepper spray to jail environments, if Womack was the individual responsible for crafting the policy with regard to the use of the spray and made the decision to use it on Cuzzort, the municipality can be held liabile under *Monell v. Department of Social Services*, 436 U.S. 658, 691-92 (1978), for the force used against Cuzzort in the instant case. *See McMillian v. Johnson*, 88 F.3d 1573, 1577 (11th Cir.1996), *aff'd sub nom McMillian v. Monroe County, Ala.*, 520 U.S. 781 (1997).

## Conclusion

For the foregoing reasons, the defendants' motion for summary judgment will be GRANTED, in part, and DENIED, in part. All claims against Smith and Amos will be DISMISSED, with prejudice. Any excessive force claim arising out of the placement of Cuzzort face down in the back of Smith's patrol vehicle will be DISMISSED, with prejudice. All claims premised on the Americans with Disabilities Act will be DISMISSED, with

prejudice. The sole remaining claims are those against Womack and the City of Albertville for excessive force relating to the use of pepper spray on the decedent, Cuzzort.

DONE and ORDERED this 30th day of April 1999.

_____
H. DEAN BUTTRAM, JR.
UNITED STATES DISTRICT JUDGE